2020 IL App (1st) 172994-U

No. 1-17-2994

Order filed December 15, 2020.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 99 CR 20865 |
| | ) | |
| DAVID JOHNSON, | ) | The Honorable |
| | ) | Michael P. Toomin and |
| Defendant-Appellant. | ) | Nicholas Ford, |
| | ) | Judges Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: Defendant was entitled to an evidentiary hearing on his successive postconviction petition where he made a substantial showing of actual innocence.

¶ 2    Following a jury trial, defendant David Johnson was convicted of several offenses that occurred during the armed robbery of the Pot O' Gold Liquor Store (Pot O' Gold) (8658 S. Ashland) on August 10, 1999. Those offenses included the first-degree murder of Yousef Ali, the

attempted first-degree murder of Officer Phillip Rider, the attempted first-degree murder of

Naser Naser, the aggravated battery of Walid Awadh, and the armed robbery of Naser and

Awadh.

¶ 3    Ultimately, defendant filed a successive petition seeking relief under the Post-Conviction

Hearing Act (Act) (722 ILCS 5/122-1 *et seq.* (West 2010)). He attached affidavits from three

codefendants in support of his actual innocence claim. Those codefendants essentially averred

that in contrast to evidence produced at trial, codefendant Andrell Parham, rather than defendant,

was the individual who fired shots at Officer Rider. Codefendants also alleged that defendant

was unaware of their intent to rob the Pot O' Gold until the matter was a *fait accompli*. Before

defendant knew what was happening, Ali lay dead, Officer Rider, Naser and defendant himself

were shot, and Awadh was injured. The trial court dismissed the petition without an evidentiary

hearing. We now reverse and remand for further proceedings under the Act.

¶ 4                                    I. Background

¶ 5                                    A. Pretrial

¶ 6    Defendant was charged with the aforementioned offenses alongside codefendant Parham,

codefendant Sherman Ward and codefendant Alfred Moore.[1] Before trial, defendant filed

motions to quash his arrest and suppress a videotaped inculpatory statement he had made after he

was arrested at the Jewel grocery store (9410 S. Ashland). Defendant alleged, in pertinent part,

that the police assaulted him.

¶ 7    Extensive evidence was presented at two hearings on the pretrial motions, held on the

same day. The testimony at the hearing on the motion to quash arrest and suppress evidence

essentially showed that the police followed a blood trail from the Pot O' Gold, to a house, where

---

[1]Moore was apparently charged one year later than defendant, Ward and Parham.

a resident had helped defendant notify his mother he had been shot, to the Jewel. Before being arrested at the Jewel, defendant ran and tried to climb over a fence. The trial court denied defendant's motion to quash, finding the police had probable cause.

¶ 8    At the hearing on defendant's motion to suppress his inculpatory statement, defendant testified, consistent with his statement, that police officers kicked him when he was arrested. He added that at the police station, two officers got in his face, yelled, screamed and used profanity. According to defendant, he told Assistant State's Attorney Nancy Wilder that he did not "do the crime." Defendant also testified that he did not have a gun on the day in question, although there had been a gun in the car. Additionally, ASA Wilder testified that before meeting with defendant, she was aware that he had originally denied involvement in the shooting. Defendant had also told her he was kicked when arrested. Defendant's mother, Gloria Johnson, testified that while witnessing defendant's arrest, she saw multiple officers kick him for about 10 minutes.

¶ 9    The trial court denied defendant's motion to suppress, finding, among other things, that while defendant said he was kicked by officers, he had tried to escape and resist arrest. Defendant "ended up at the Jewel store where he was subsequently arrested and tried to escape, tried to resist arrest, had to be chased, physically subdued. There was a struggle. Whatever kicking or fighting occurred during the course of subduing the defendant, I believe it was so remote in time that it had utterly no effect upon what happened at the police station."

¶ 10                              B. Trial and Direct Appeal

¶ 11 Defendant and Ward were tried simultaneously by two juries. Officer Rider testified that on August 10, 1999, he had the day off and drank beer with friends from about about 8 p.m. to 10 p.m. Officer Rider, who was not intoxicated, then drove his 1994 Ford Thunderbird to the Pot O' Gold to buy a six-pack. When he arrived, he saw a crowd gathered on the sidewalk and

another car parked near the store. Officer Rider did not know if that car was running but observed one person sitting in the front driver's seat and another sitting in the passenger's side of the backseat. As Officer Rider approached the store, the people on the sidewalk told him not to enter because a robbery was in progress. He was dressed in plain clothes at that time.

¶ 12    A black subject then ran out of the store, carrying liquor bottles. As he attempted to put the bottles in the car parked near the store, a weapon fell from his waistband and skidded along the pavement. Officer Rider drew his weapon, trying to cover that car's occupants as well as the subject who exited the store. He said, "freeze, police officer." Then, "at least two shots rang out from the interior of the passenger side of the vehicle" but the muzzle flash came from the driver's seat. Officer Rider had an unobstructed view of the person shooting at him. In court, he identified that person as defendant. When asked if he was looking directly at the face of the backseat passenger, Officer Rider answered, "[o]nly partially."

¶ 13    After being shot in the chest, Officer Rider fired six shots into the car before his weapon ran out of ammunition and he retreated inside the store. He displayed his star and told a young man with blood running from his forehead to call 911. Officer Rider reloaded his weapon and attempted to determine if other offenders were still inside, but he apparently found only two customers who were crouched down in an aisle. The young man eventually brought him the phone to call 911.

¶ 14    While Officer Rider was at the hospital, officers brought him "computer generated copies of photographs," comparable to a Xerox reproduction. He did not feel comfortable identifying anyone from the photographs because they were black and white, grainy and not of a very good quality. He testified, "I wanted to be absolutely sure that the person I did identify was in fact the person who shot me." He later identified defendant as that person from a lineup. Additionally,

Officer Rider tentatively identified Ward as the person seated in the rear of the car, although he would not call it a positive identification. About 11 months later, Officer Rider identified Moore from a lineup as the person who dropped the gun. Officer Rider also remembered "possibly tentatively identifying someone else as being there." The parties later stipulated during defendant's case that at about 12:56 a.m. on August 12, 1999, Officer Rider failed to identify Ward from a lineup. When speaking to officers after the shooting, Officer Rider did not mention that he had been drinking.

¶ 15     Awadh testified that Naser and Ali, to whom Awadh was related, worked at the Pot O' Gold. At about 10:20 p.m. on the day in question, Awadh was visiting them at work and bagging groceries while Naser worked the cash register. At that time, four men entered, three approached the counter and one raised a gun, telling Naser and Awadh to raise their hands. When they complied, the gunman shot Naser's hand and he fell to the floor. Ali ran to the back of the store and the fourth man went after him. Awadh then heard three gunshots. The parties later stipulated during defendant's case that defendant told Detective Owens that three offenders, rather than four, entered the store.

¶ 16     When Naser fell, the man who shot him fired another bullet into his foot. Awadh, followed by one of the perpetrators, ran toward the lottery machine. The perpetrator, who Awadh identified in court as Ward, put a gun to Awadh's head. Awadh gave him the money from the lottery machine as the two men by Naser took money from the register. Ward hit Awadh on the head two times, causing him to bleed, and made Awadh close his eyes and walk toward the cooler. When Awadh opened his eyes, he saw that the perpetrators were gone, and Ali was dead. A police officer subsequently entered and asked to use the phone.

¶ 17    At the hospital, the police showed him photographs but he was confused, scared and did not want to look at them. Awadh then went to the police station to look at a lineup. Although Awadh recognized Ward in the lineup, Awadh did not identify him because he was afraid. He subsequently identified Ward from a second lineup the same day. Awadh did not identify defendant in either lineup.

¶ 18    Naser added that about 10 customers were in line when a gunman approached the counter, pointed the gun at Naser and demanded money. Naser put his hands up and said he would give the man the money, but the man shot Naser's right hand, causing him to fall down. The gunman came over the counter and shot at Naser two more times, striking him once in the leg. Subsequently, the gunman and other man helped Naser up to open the register. The gunman then hit Naser on the head with a gun, causing him to fall again. Additionally, Naser heard three or four gunshots. Naser was unsure whether he had seen defendant in the store. Later at the hospital, he identified a photograph of the man who had a gun over his head.

¶ 19    Detective William Kazupski testified that on the night in question, police followed blood trails to the Jewel. From the parking lot, Detective Kazupski saw defendant exit the store. Officer Timothy Poland, who was in defendant's path, told him to stop but defendant instead ran full force into the officer, causing him to fall backwards and his gun to discharge. Defendant subsequently ran to a wrought iron fence, but Detective Kazupski pulled him from the fence, and placed him on the ground. Defendant's hands and shirt were covered in blood. Detective Kazupski testified that once on the ground, defendant did not resist arrest. He denied that defendant was kicked by several officers.

¶ 20    The physical evidence showed that a .25-caliber semiautomatic Taurus pistol, a discharged .25-caliber cartridge case and defendant's blood were found in the front passenger

area of the maroon Ford parked at the scene. A discharged .25-caliber cartridge case was also recovered from under the driver's side of the vehicle, in front of the back tire. It could not be definitively determined whether the cartridge cases were or were not fired from the Taurus. Evidence technician Patrick Moran testified that if an individual in the driver's seat fired a weapon by pointing it out his window, it was possible that the shell casing could end up in the front passenger seat. Additionally, a medium caliber fired bullet was found in a nearby gutter. While that bullet could not have been fired from the Taurus, or a firearm that Ward's girlfriend later found outside her garage, Officer Rider's weapon could not be eliminated as the weapon that discharged the bullet. Furthermore, the bullet found under Ali was fired from the same weapon that fired three shots into Ali's body. Those .32-caliber bullets were not fired from any weapon submitted in this case, however.

¶ 21     ASA Ward testified that she took defendant's videotaped statement. Before making the statement, outside the presence of the police, defendant told her he had been treated fine, although he had also told her he was kicked by police at his arrest. Defendant's videotaped statement was played for the jury.[2]

¶ 22     Defendant, then 20 years old, stated that he was in front of his home with his sister, his girlfriend, her friend and his sister's boyfriend when Ward, C.C. and Trip approached in Trip's burgundy Ford. They asked him to go for a ride and he got in the car. When ASA Ward asked defendant if he had a gun when he got in the car, defendant answered, "Yeah, *** it was already in the car. I never took it out of the car." C.C. said he knew a place to do a stickup at 80th and Ashland. Trip then drove them to 87th and Ashland. The group was supposed to go inside to get some beer and cigarettes. Defendant wanted a soda.  When defendant got out of the car, C.C.

---

[2]Our record contains the transcript of that statement but not the videotape itself.

said, "start the car if anything [happens]," which defendant took to mean "they was gonna hit the place." The group entered the store. After defendant got a Hawaiian Punch and paid the boy behind the counter, Trip "upped his gun" and demanded money. C.C. and Ward pulled out their weapons too. Customers ran out of the store, as did defendant. Defendant sat in the driver's seat of the car and, at some point, Ward sat in the back-passenger's seat. Defendant heard, "pop pop pop pop." Then, the customers who had run out of the store returned with a policeman and yelled that Trip's Ford was involved in the stick-up. When defendant looked up, "he," apparently referring to Officer Rider, had his gun drawn. Defendant fired one time out of the open driver's side door and the officer shot defendant once in his hand and twice in his back.

¶ 23    Defendant said he ran from the scene and knocked on the door of a woman he did not know. He asked her to call his mom and tell her he had been shot. He felt overheated at that house, so he knocked on the house next door. When no one answered, he went to the Jewel, where officers saw him and said, "catch that motherfucker." Defendant threw the pop he was about to buy and ran. An officer approached and fired one shot. The officer ordered defendant to stop but he did not comply. Instead, he ran to a big gate and tried to climb it, but the police pulled him down. The police "kicked him for a second" until "the Sarge" said to stop. Defendant stated that since his arrival at Area 2, he had been treated well.

¶ 24    As stated, the jury found defendant guilty of the aforementioned offenses. The trial court imposed a cumulative sentence of 85 years in prison.

¶ 25    On direct appeal, defendant asserted that the trial court erroneously denied his motion to suppress his videotaped statement, that the State failed to prove he was guilty of Ali's murder, and that the trial court erred by imposing consecutive sentences. In affirming the trial court's judgment, the reviewing court found that defendant sat in the driver's seat, ready to start the car

if necessary. "While defendant's act of shooting the policeman would not by itself support a [murder] conviction on an accountability theory, it was relevant to show that defendant voluntarily attached himself to [a] group bent on illegal acts with knowledge of its design." *People v. Johnson*, No. 1-01-0634 (2003) (unpublished order pursuant to Illinois Supreme Court Rule 23).

¶ 26                                    C. Postconviction Proceeds

¶ 27    On July 19, 2005, defendant, through private counsel, filed a petition under the Act. In support of his actual innocence claim, defendant submitted the unnotarized "affidavit" of Ward. According to the document, defendant "did not have any knowledge what was about to happen at the Pot of Gold . . . or did anything to get that time and sentencing." The trial court summarily dismissed the petition, finding that the document did not qualify as an affidavit and was otherwise conclusory. Specifically, the court found that Ward did not implicate himself, did not say he was present and did not explain how he would know what defendant did or did not know. We affirmed the trial court's judgment pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), agreeing with appellate counsel's assessment that there were no issues of arguable merit. *People v. Johnson*, No. 1-05-3484 (2003) (unpublished order pursuant to Rule 23).[3]

¶ 28    On October 27, 2011, defendant filed a *pro se* motion for leave to file the instant successive postconviction petition, reasserting his actual innocence. In support thereof, he supplied affidavits from all three codefendants. Defendant also alleged that "his family begged [codefendants] to step forward and tell the truth," but they previously asserted their fifth amendment privilege against self-incrimination. Additionally, defendant maintained that his inculpatory statement was coerced.

---

[3]We note that neither our decision on direct appeal nor our decision on appeal from the dismissal of defendant's first postconviction petition were included in our record on appeal.

¶ 29     Parham's affidavit stated that he had previously followed his attorney's advice not to come forward, although defendant, his family and his friends had repeatedly asked him to tell the truth about the incident. He stated, "my conscious [*sic*] has began to eat at me, so irregardless, I want the truth to be known." According to Parham, Moore was driving him and Ward around on the day in question. The three men planned to rob a store at 120th and Western but when they arrived, the store was closed. While driving around, Moore saw defendant, a friend of his, and pulled over. Moore was speaking to his friend when Ward suggested they all go to the Pot O' Gold to get cigarettes and drinks. Parham stated that the liquor store was usually crowed so they had not planned to rob it. "I think Moore offered to give [defendant] a lift."

¶ 30     When they arrived, defendant stayed in the car while codefendants went inside. Parham was moving toward the liquor when he noticed that "Moore had upped his gun on the cashier, and I turned around and saw another employee and pulled my gun and I told [Ward] to watch this other guy, I didn't know whether he was a customer or employee." When the cashier moved too slowly, Moore shot him in the hand. The cashier fell and Moore shot him a couple more times. Meanwhile, "this other employee runs for the back and I follow him and I shot him a few times, so I was the one who killed Yousef Ali." Once Ward and Moore had obtained the money from the register and lottery machine, the group left. According to Parham, he was the first codefendant out the door, followed by Ward.

¶ 31     When "some guy" started to enter the store, Parham told him not to go inside because a robbery was in progress. The man pulled out a gun so Parham pulled out his own. Parham did not know the man was an off-duty police officer. Then, Moore exited with bottles of liquor. He was putting them in the car when the man started shooting at it. Parham shot at the man a couple

of times, hitting him. The man ran inside, and Moore and his passengers split up after discovering that defendant had been shot three or four times.

¶ 32    According to Parham, he helped defendant make it to the Jewel. They parted ways but Parham remained nearby. Parham saw that when defendant was arrested after attempting to climb the fence, "two officers, plus more get around [defendant] and kick the shit out of him." Parham turned himself in two weeks later, and "after taking a beating myself, I agreed to give a videotaped statement and say just about anything they wanted me to say." Parham alleged that defendant "was never involved in the robbery, he never went inside, and he didn't even know a robbery was occurring until I told that guy approaching the store not to go in because a robbery was occurring."

¶ 33    Moore's affidavit similarly stated that he had previously followed his attorney's advice not to come forward despite requests made on defendant's behalf. Additionally, Moore repeated Parham's account of what happened before codefendants encountered defendant. After Moore pulled over to talk to defendant, Moore told defendant that he was going to the Pot O' Gold to buy drinks and cigarettes and invited defendant to come along. Moore said he would drive him home later. At the liquor store, defendant stayed in the car listening to the radio and codefendants went inside. Moore stated that he spontaneously approached the man behind the counter, pointed a gun at him and demanded money. "I knew my co-defendant[]s would go along with the robbery." When the man hesitated, Moore shot his hand and he fell down. Moore then "busted a couple more rounds down at him, thinking he was going for a gun." Meanwhile, Parham chased another employee and Moore heard about four gunshots. When another employee ran toward the lottery machine, Ward followed him. Ward and Parham left the store first. As Moore exited, carrying liquor bottles, his gun fell out and slid on the ground. He was about to put the bottles in

the car when "some off duty cop just emptied his gun into the car, he didn't even announce that he was a cop, and [Parham] popped off a couple shots at the cop." Defendant was unarmed and did not know that a robbery was taking place. After the off-duty cop went inside the store, Moore and his passengers split up. When the police arrested and interviewed Moore a year later, they bragged "how all they had to do to [defendant] was hit him a few times and apply a little pressure to those fresh gunshot wounds and not only did he confess to doing a robbery that they knew he didn't do, but he would have said his mother did it with a couple more squeezes."

¶ 34    In Ward's second affidavit, he alleged that he lacked access to a notary when he provided an affidavit "in 2009" and that his affidavit was vague because he was only told to tell the truth about defendant's participation. Ward's second affidavit essentially repeated Parham and Moore's account of what occurred before defendant joined them on the day in question. Ward stated that defendant did not know that a robbery was going to occur. While Moore spoke with defendant, Ward suggested they get drinks and cigarettes at the Pot O' Gold, but "[t]here was no plan to rob it." Defendant accepted Moore's offer of a ride but stayed in the car when they arrived at the Pot O' Gold. Defendant was seated in the rear driver's side passenger seat. Ward said that when there appeared to be only one customer inside, Moore pulled out his gun and demanded the cashier's money. Ward's account of what ensued in the store substantially corroborated his codefendants' account.

¶ 35    Upon exiting, Parham left first, followed by Ward, and they got in the car. When a car pulled up and a man approached the store, Parham told him not to enter because a robbery was in progress. Moore exited with liquor bottles and dropped his gun. The man then shot into Moore's car, with no warning, and Parham returned fire. The man was hit and ducked into the store. When defendant said he had been shot, Parham offered to get defendant help. Upon Ward's

arrest, "they beat me and [defendant], before they sent him to the hospital and me to jail."

According to Ward, his prior videotaped statement implicating defendant was false. Ward

"implicated him because the police beat my ass every time I said he wasn't involved because

they kept saying he shot this officer, and I knew that not to be true, he wasn't even armed, and

was just there for a ride."

¶ 36    Finally, defendant submitted his own affidavit, which stated that he was innocent, was

coerced into confessing, and had been unable to persuade codefendants to tell the truth sooner. In

2005, Ward gave defendant's family a signed document, but defendant's attorney never

contacted Ward and believed the document would be enough to get an evidentiary hearing. In

response, the State moved to dismiss defendant's petition, arguing that the attached affidavits

were insufficient to establish actual innocence. The trial court granted the State's motion to

dismiss the petition without an evidentiary hearing.

¶ 37                               II.  Analysis

¶ 38    On appeal, defendant asserts that the trial court erroneously dismissed his successive

postconviction petition because he made a substantial showing of actual innocence. In response,

the State asserts that defendant's claim of actual innocence is positively rebutted by the record

and that the affidavits attached to defendant's petition were not of such a conclusive character

that they would probably change the result on retrial.

¶ 39    The Act contemplates the filing of a single petition. *People v. Coleman*, 2013 IL 113307,

¶ 81. Additionally, successive petitions under the Act are highly disfavored. *People v. Bailey*,

2017 IL 121450, ¶ 39. A constitutional claim not raised in a defendant's original or amended

petition is waived. *Coleman*, 2013 IL 113307, ¶ 81 (citing 725 ILCS 5/122-3 (West 2010)).

Courts will relax that statutory bar, however, where a defendant demonstrates actual innocence.

*People v. Ortiz*, 235 Ill. 2d 319, 329 (2009). Moreover, a "[d]efendant is not precluded from raising multiple claims of actual innocence where each claim is supported by newly discovered evidence." *Id*. at 333.

¶ 40    Where the trial court grants a defendant leave to file a successive petition, as was the case here, the petition is docketed for second-stage proceedings. *People v. Robinson*, 2020 IL 123849, ¶ 43. At the second stage, the defendant has the burden of making a substantial showing that a constitutional violation occurred. *People v. Domagala*, 2013 IL 113688, ¶ 35. Mere conclusions are not sufficient. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). Additionally, courts must take all well-pled allegations as true unless positively rebutted by the trial record. *Robinson*, 2020 IL 123849, ¶ 45. Moreover, new evidence is not positively rebutted merely because it contradicts evidence presented at trial; rather, new evidence is positively rebutted only where it is clear from the trial record that no trier of fact could ever accept the veracity of that evidence. *Id*. ¶ 60; see *e.g.*, *People v. Sanders*, 2016 IL 118123, ¶ 48 (finding the witness's new assertion that he shot the victim once, was positively rebutted by the record, which showed that the victim was shot twice). Similarly, evidentiary questions, including credibility determinations and factfinding, are not to be resolved at this stage. *Domagala*, 2013 IL 113688, ¶ 35.

¶ 41    To succeed on an actual innocence claim, the defendant must provide new, material, noncumulative evidence that is so conclusive that it would probably alter the result on retrial. *Coleman*, 2013 IL 113307, ¶ 96. Actual innocence claims are rarely successive because such evidence is unavailable in most cases. *People v. Edwards*, 2012 IL 111711, ¶ 32. "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96. Additionally, evidence is material where it is both relevant and probative of the defendant's innocence. *People v. Warren*, 2016 IL

App (1st) 090884, ¶ 80. Evidence is cumulative, however, where it fails to add anything to the evidence presented at trial. *Ortiz*, 235 Ill. 2d at 335. Yet, corroborative evidence is not synonymous with cumulative evidence. *People v. Warren*, 2016 IL App (1st) 090884, ¶ 81.

¶ 42     Moreover, the new evidence need not be dispositive to satisfy the requirement that such evidence be so conclusive that it would probably alter the result on retrial. *Robinson*, 2020 IL 123849, ¶ 48. Rather, the new evidence need only show that all of the facts and circumstances, including the defense witnesses, should be scrutinized more closely in determining the defendant's guilt or innocence. *Ortiz*, 235 Ill. 2d at 336. Stated differently, new evidence is of a conclusive character where, if considered along side the trial evidence, the new evidence would probably lead to a different result. *Robinson*, 2020 IL 123849, ¶ 47. The ultimate question is whether the new evidence places trial evidence in a different light and undermines confidence in the judgment. *Id*. ¶ 48. Probability, not certainty, is key in determining whether evidence is of a conclusive character. *Id*. Although evidence of actual innocence must support complete vindication or exoneration, a witness statement that is exonerating and contradicts a State witness is capable of producing a different result on retrial. *People v. Adams*, 2013 IL App (1st) 111081, ¶ 36.

¶ 43     Here, we find defendant has made the substantial showing of actual innocence necessary to proceed to an evidentiary hearing. First, the State does not dispute that defendant has presented new evidence from his codefendants. No amount of diligence can force a codefendant to forgo his fifth amendment right to avoid self-incrimination. *Edwards*, 2012 IL 111711, ¶ 38; *Coleman*, 2013 IL 113307, ¶ 102 (finding that the evidentiary hearing testimony of five men who were admittedly involved in or present for the offense constituted new evidence where they

likely would have asserted their fifth amendment privilege if called to testify at trial, notwithstanding that before trial, defense counsel may have known of their roles in the offense).

¶ 44    We also find the new evidence was material. Defendant was convicted as the principle in the shooting of Officer Rider and as an accomplice to the other offenses, including the murder of Ali. Evidence that codefendant Parham, rather than defendant, shot Officer Rider, is certainly relevant and probative as to whether defendant personally shot the officer. Additionally, codefendants' assertions - that defendant could not have known of their criminal intentions until after codefendants left the store and Parham shot Officer Rider - are relevant and probative to defendant's accountability for the offenses. See 720 ILCS 5/5-2 (West 1998) (stating that "[m]ere presence at the scene of a crime does not render a person accountable for an offense," although a person's presence can, with other circumstances be considered in assessing accountability).

¶ 45    Notwithstanding our determination that new evidence of a different shooter and a lack of a criminal plan would be material here, codefendants' allegations regarding police abuse were not alone material. Moore stated that a year after the incident, the police bragged that they tortured defendant to confess to a crime he did not commit. Ward stated that the police beat defendant. Neither codefendant stated that they witnessed defendant being beaten, however. We find their allegations to be merely conclusory. In addition, Parham testified that he witnessed defendant being kicked. Standing alone, however, this does no more than impact the credibility of defendant's videotaped statement. Taking Parham's allegation as true, it is not evidence of actual innocence. To the extent Parham and Ward averred that officers coerced them into falsely implicating defendant in their own pretrial statements, we note that codefendants' pretrial statements were not admitted as evidence against defendant at his trial or attached to the parties'

pleadings filed under the Act. Neither party has cited authority for the notion that we can consider codefendants' pretrial statements at this stage.

¶ 46 At trial, defendant presented the uncorroborated defense that he did not shoot Officer Rider and was not part of a plan to rob the Pot O' Gold. Codefendant Parham now states that he was the individual who shot Officer Rider. This certainly adds something new to the evidence submitted to the jury. *Coleman*, 2013 IL 113307, ¶¶ 102-03 (finding that the evidentiary hearing testimony of five men, who admitted they were involved in or present for the offense but testified that the defendant was not, was material and noncumulative, notwithstanding that another witness had provided uncorroborated testimony at trial that the defendant was not present for the offense). Additionally, the jury heard evidence that defendant was part of his codefendants' criminal plan. Thus, his codefendants' new proposed testimony that there was no plan for defendant to even know of, that the criminal offenses unfolded spontaneously, and that defendant did not participate in any way, cannot be considered cumulative.

¶ 47 Moreover, we reject the State's assertion that defendant has not made a substantial showing that this new evidence is so conclusive that it would probably alter the result on retrial. At this stage, we must take codefendants' averments as true. This new evidence would, of course, be pitted against Officer Rider's testimony and defendant's video-taped statement that defendant was the individual who shot the officer. Yet, mindful of the prohibition against credibility determinations at this stage, we find defendant has made a substantial showing that in this contest of three against two, a probability exists that a jury would find defendant did not shoot the officer, particularly considering that Parham placed the culpability on his own shoulders. See *People v. Pecoraro,* 144 Ill. 2d 1, 11 (1991) (recognizing that a jury is entitled to weigh the credibility of a defendant's confession and may accept all, part or none of the

confession); *People v. Burgund*, 2016 IL App (5th) 130119, ¶ 146 (stating that a defendant has the right to present evidence affecting the credibility of his confession).

¶ 48    The new evidence would also be pitted against defendant's videotaped statement acknowledging that he was informed of the plan to stickup the Pot O' Gold prior to the robbery. Again, defendant has made a substantial showing that a jury would probably resolve this three to one contest in his favor and find he was unaware of any plan or ongoing criminal activity. We further note that a trier of fact could consider eyewitness testimony that the police kicked defendant in assessing the credibility of other evidence presented at a third-stage hearing, notwithstanding our determination that codefendants' allegations in his regard did not alone satisfy the materiality requirement of an actual innocence claim.

¶ 49    Finally, the State raises numerous discrepancies and omissions as to the number of customers in the Pot O' Gold, Moore's reason for initiating the robbery, defendant's presence in the store, the order in which codefendants exited, who told Officer Rider that a robbery was in progress, who fired first, where defendant sat in the car and whether Parham accompanied him to the Jewel. We also observe that although Officer Rider testified the muzzle flash came from the driver's seat, and defendant's blood was found in the front passenger's area, Parham did not specify where he was located when he allegedly shot the officer. While these issues are many, none would categorically preclude any trier of fact from ever accepting the veracity of defendant's and codefendants' allegations. *Robinson*, 2020 IL 123849, ¶ 45. These issues do not positively rebut defendant's claim. Instead, they invite factfinding and credibility determinations. *Cf. Sanders*, 2016 IL 118123, ¶ 48 (finding the witness's new assertion that he shot the victim once, was positively rebutted by the record showing that the victim was shot twice).

¶ 50    To be clear, we do not find that defendant is actually innocent. We do not consider whether defendant will be able to meet his burden at an evidentiary hearing. We find only that taking the allegations as true, defendant has made a substantial showing that this case is worth another look at an evidentiary hearing. See also *People v. Lofton*, 2011 IL App (1st) 100118, ¶¶ 37-39 (finding the defendant's actual innocence claim was entitled to proceed to the third stage where, (1) the defendant's assertion that he was not at the scene was previously uncorroborated, (2) an alibi witness was now available, and (3) a codefendant, who was acquitted, now acknowledged  he was the shooter and that the defendant was not present).

¶ 51                                 III. Conclusion

¶ 52    Defendant has made a substantial showing of actual innocence. Accordingly, we reverse and remand for further proceedings under the Act.

¶ 53    Reversed and remanded.